J. S84042/18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
v. :
:
JOSHUA BENSON, : No. 762 EDA 2018
:
Appellant :

Appeal from the Judgment of Sentence, February 9, 2015,
in the Court of Common Pleas of Bucks County
Criminal Division at Nos. CP-09-CR-0001877-2014,
CP-09-CR-0003264-2014, CP-09-CR-0003265-2014,
CP-09-CR-0003266-2014, CP-09-CR-0007832-2013,
CP-09-CR-0007833-2013, CP-09-CR-0007834-2013,
CP-09-CR-0007968-2013, CP-09-CR-0007969-2013

BEFORE: BENDER, P.J.E., OTT, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED MARCH 22, 2019**

Joshua Benson appeals from the February 9, 2018 judgment of sentence entered in the Court of Common Pleas of Bucks County following his conviction in a jury trial of three counts of rape, two counts of involuntary deviate sexual intercourse, nine counts of sexual assault, five counts of aggravated indecent assault without consent, five counts of indecent assault without consent, and one count of indecent assault by forcible compulsion.[1] These charges stem from appellant's convictions of sexually assaulting ten teenage girls. The trial

---

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 3123(a)(1), 3124.1, 3125(a)(1), 3126(a)(1), and 3126(a)(2), respectively.

court imposed an aggregate sentence of 57½ to 115 years of incarceration. We affirm.

Following his convictions,

> [n]o post-sentence motions were filed. On March 6, 2015, [a]ppellant filed a notice of appeal to the Superior Court. On September 21, 2015, [a]ppellant filed a Praecipe for Discontinuance and subsequently withdrew his appeal.
>
> On September 12, 2016, [a]ppellant filed a Petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.[A.] § 9541 *et seq.* [The trial court] issued an Order on January 24, 2017, directing [a]ppellant to file an Amended PCRA Petition. Appellant filed an Amended PCRA Petition on February 24, 2017. On January 19, 2018, [a]ppellant filed a second Amended PCRA Petition. On February 5, 2018, upon agreement of the parties, [the trial court] granted post-conviction collateral relief in the form of reinstating [a]ppellant's right to file a motion for reconsideration of sentence and a direct appeal therefrom *nunc pro tunc*.
>
> On February 9, 2018, [a]ppellant filed a Motion for Reconsideration of Sentence. Following a hearing held February 28, 2018, [the trial court] denied [a]ppellant's Motion. On March 12, 2018, [a]ppellant filed a timely Notice of Appeal to the Superior Court.

Trial court opinion, 6/20/18 at 23-24.

The trial court ordered appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P 1925(b). Appellant timely complied. Thereafter, the trial court filed its Rule 1925(a) opinion.

Appellant raises the following issue for our review: "Did the [trial court] err in denying [a]ppellant's motion in limine regarding the statement that he had slept with 87 women?" (Appellant's brief at 4.)

J. S84042/18

Having determined, after careful review, that the learned trial court, the Honorable Rea B. Boylan, in her June 20, 2018 Rule 1925(a) opinion, ably and comprehensively disposes of appellant's issue on appeal, with appropriate reference to the record and without legal error, we affirm on the basis of that opinion wherein the trial court concluded that:

> [a]ppellant argues that this Court improperly denied his Motion in Limine to exclude an admission to investigators that he had previously slept with 87 women. We find that this statement was relevant to establish the context of the statements he made about the sexual assaults of the ten victims and the reason that investigators took steps to identify additional victims. We further find that the probative value of this statement outweighed its potential for unfair prejudice, and that this Court's subsequent cautionary instruction to the jury ameliorated any remaining prejudicial effect.

Trial court opinion, 6/20/18 at 24.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/22/19

- 3 -

**IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CP-09-CR-0003266-2014 |
| | : | CP-09-CR-0003265-2014 |
| v. | : | CP-09-CR-0003264-2014 |
| | : | CP-09-CR-0001877-2014 |
| JOSHUA R. BENSON | : | CP-09-CR-0007969-2013 |
| | : | CP-09-CR-0007968-2013 |
| | : | CP-09-CR-0007834-2013 |
| | : | CP-09-CR-0007833-2013 |
| | : | CP-09-CR-0007832-2013 |

**DO NOT PUBLISH**

**OPINION**

Defendant Joshua Benson ("Appellant") appeals to the Superior Court of Pennsylvania from the denial of post-sentence motions on February 28, 2018. On August 18, 2014, Appellant proceeded to a consolidated jury trial on the nine criminal cases referenced above. On August 22, 2014, the jury found Appellant guilty of sexually assaulting ten teenage girls over a two-year period. (The specific convictions are identified during the discussion of the factual background of each offense). On February 9, 2015, this Court imposed an aggregate sentence of 57 ½ to 115 years in a state correctional facility. Appellant challenges this Court's denial of his Motion in Limine to exclude a statement he made to investigators that he had slept with 87 women. We file this Opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

## I. FACTUAL BACKGROUND

The relevant factual background of each case is discussed below:

### A. Criminal Information No. 7832-2013

Victim R.A. was a fourteen-year-old student at Bensalem High School in Bucks County when she met Appellant on the website myyearbook.com. N.T. 8/19/14, pp. 148-150. They began to communicate via text-message. Through these conversations, Appellant asked R.A. whether she was a virgin, which she confirmed. Id. at 166. In July, 2012, R.A. asked her mother



1

to drop her off at the high school to meet the Appellant. Id. She remembered that it was July because she had just returned from a vacation in Ocean City, Maryland, and her mother had purchased Rita's water ice due to the hot weather. Id. 148-150, 187. R.A. thought the meeting place would be safe because it was happening at a high school. Id. at 153. She saw Appellant sitting on the stairs of the high school when her mother dropped her off at the front of the campus. Id. When her mother left, R.A. did not see anyone else on the campus except for landscapers. Id.

After talking for a few minutes, Appellant and R.A. walked through the parking lot to a grass field in front of the high school's football field and sat down in the grass next to each other. Id. at 154, 163. While sitting, Appellant began to kiss R.A. and pushed her back onto the grass. Id. at 164-165. As R.A. lay on her back, Appellant pulled down his pants, removed her shorts and underwear, and climbed on top of her. Id. at 164-166. R.A. then felt his penis penetrate her vagina. She described feeling a sharp pain in that area and saw blood between her legs. Id. at 167. Prior to and during the intercourse, R.A. said, "no" and "stop" several times, but the Appellant did not acknowledge her. Id. at 169. Appellant also attempted to unclip and remove her bra, but was unsuccessful. Id. at 170.

R.A. and Appellant subsequently stood up and clothed themselves, and her mother sent a text message stating that she would pick up R.A. at the front of the school. Id. at 168. After they had intercourse, Appellant told R.A., "you're my girlfriend now." Id. at 170. They waited at the front of the school without speaking to each other for a few minutes until R.A.'s mother picked her up. Id. at 170-171. R.A. did not disclose the assault until October, 2012, when she overheard another student in her gym class describe Appellant to the teacher as "amazing." Id. at

2

174-175. She disclosed the incident to the gym teacher, who then reported the assault to the school counselor and R.A.'s mother. Id.

The jury found Appellant guilty of one count of Sexual Assault, one count of Aggravated Indecent Assault without Consent, and one count of Indecent Assault without Consent.

## B.    Criminal Information No. 7833-2013

In 2011, victim M.D. was a freshman-year classmate of the Appellant's younger sister at Bensalem High School. Id. at 194-196. In December of that year, Appellant's sister invited M.D. to a sleepover at the Appellant's home in Bensalem on a Friday after school. Id. at 198-199. Although the sleepover was initially planned for Friday night, M.D. stayed for the entire weekend. Id. M.D. met the Appellant for the first time at that sleepover. On Saturday night, they had a "heart to heart" about various family issues. Id. M.D. and Appellant also began "cutting," or using a razor blade to self-mutilate, during that conversation. Id. at 200. After everyone else in the home went to bed, Appellant kissed M.D. Id. at 202. During this conversation, M.D. told Appellant that she was a virgin. Id. at 206.

M.D. returned to Appellant's home the following Tuesday after school to visit Appellant's sister. Id. at 203. After dropping off her belongings in the sister's bedroom, M.D. "ended up being dragged by [Appellant] into his [bedroom]." Id. at 203. In his bedroom, M.D. and Appellant began "making out, it seemed harmless, and then my pants were coming off. I wasn't really happy with it, I said no and stop, and he didn't." Id. Appellant then removed his own pants and penetrated M.D.'s vagina with his penis. Id. Although M.D. attempted to push Appellant off, he moved her hands and held them to the side or above her head. Id. at 205. At one point during the assault, Appellant said that he couldn't stop because "he didn't want to get blue balls." Id. While Appellant initially used a condom, he removed it during intercourse and ejaculated onto the bed. Id. at 204-205.

3

M.D. returned to the home later that week to see Appellant's sister. Id. at 207. When she returned on this occasion, she was again sexually assaulted by the Appellant in his bedroom in a similar manner. Id. During this assault, M.D. began to scream because of the pain, so Appellant shoved a pair of "Dr. Pepper and red" colored pajama pants into her mouth. Id. at 208. Appellant also digitally penetrated her vagina and performed oral sex upon her. Id. at 209. Again, Appellant ignored M.D.'s pleas for him to stop. Id.

In January, 2012, during the school's winter break, M.D. disclosed the assaults to her friend, who subsequently used M.D.'s cellphone to end the relationship with Appellant. Id. at 211-212. The following year, M.D.'s mother became aware of the assaults because she discovered a discarded note in M.D.'s bedroom, in which the victim wrote that she "couldn't even tell [her mother] that she had been raped." Id. at 213, 236. M.D.'s mother then disclosed the assaults to the police.

After the disclosure, Bensalem Township Detective Christopher McMullen and Lieutenant Robert Gorman of the Bucks County Detectives used M.D.'s cellphone to place three recorded phone calls to Appellant between May and September, 2013. Id. at 230-248.

On September 5, 2013, one day after the third and final recorded call, McMullen and Bensalem Township Detective David Nieves interviewed Appellant regarding his assaults against M.D. Id. at 246. Appellant admitted that he had sex with M.D. "lots of times." Id. at 259. Regarding whether M.D. agreed to sex, Appellant stated the following:

> She was agreeable at first and then she asked me to stop. I was close to busting my nut, and I asked if I could continue till I busted my nut. She said it hurt a lot but I only needed one or two more strokes, then I busted my nut. I came all over her belly. The next morning it was Christmas day, and she left.

Id. When asked whether she was ever upset during intercourse, he replied, "[o]ne time she started crying during sex, not on Christmas Eve but another time after that night." Id. Finally,

4

when asked whether M.D. ever said no to having sex, Appellant admitted, "I never asked, kissing always leads to sex for me." Id. at 262.

Regarding his prior sexual history, Appellant described his first sexual experience with a girl in Washington, and stated that he wished he could contact her so that she would "know what she made me become . . . a rapist." Id. at 268-269. He further admitted that he had difficulty stopping sexual activity when a girl told him to stop, and that being told no fuels his desire for sex. Id. at 262, 271-273. He stated that being told no during sexual intercourse reminds him of his first sexual experience in Washington because he also "said no a lot" during the encounter. Id. at 270.

Appellant further admitted to having sexual intercourse with several additional women. Id. at 259, 263, 271-279. Appellant stated that he became aggressive with several of the victims during intercourse. Id. at 265-267, 270, 274. When asked "[h]ow many other girls have you had sex with," Appellant stated, "87." Id. at 278-279. Out of those 87 women, only "the virgins" said no to him during intercourse. Id. When the detectives asked Appellant to name the virgins, Appellant identified M.D., S.R., C.P., J.P., and C.S. Id. at 279. Appellant further stated that some of the other virgins resided in Utah, Washington, and New Jersey. Id. Finally, when the detectives asked Appellant to confirm whether he "managed to have sex with over 80 girls" since 2010, he answered, "[y]eah, I'm addicted to sex. Is there help available for it?" Id. at 280.

Regarding victim J.P., Appellant stated she was the first woman he had sexual intercourse with in Pennsylvania, and that they "had sex at Neshaminy Mall. I took her V Card." Id. at 263, 270.[1] In his notes of the interview, Detective McMullen wrote that Appellant was smiling and

---

[1] See Criminal Information No. 7834-2013; infra Part C, p. 8.

5

seemed proud of this admission. Id. However, regarding J.P.'s allegation of Appellant's assault

at the Cornwells Heights Train Station, he stated the following:

> The train station is made up. We did it at the graveyard and I got aggressive because I like pain. She was getting sore and I kept going. I didn't stop. She was digging her nails into my back because I like pain. I did oral sex on her, too, and I busted my nut on her stomach. We had sex in the graveyard a lot of times. I lost count of how many times.

Id. at 266. He further stated that he became aggressive with J.P. "seven or eight times," and that

she would "say stop, but I didn't." Id. at 267.

When asked whether he remembered victim R.A., Appellant stated the following:

> I remember but I thought her name was [redacted]. We were chillin[g] at Bensalem High School eating Rita's Water Ice. We laid on the grass behind the school and started making out. I rolled her over on me, then rolled her onto her back. I was kissing her neck and chest and started pulling her pants down. She said to stop so I asked her if I could spoon her and she said yes . . . Just rubbing my dick against her pussy until I bust a nut. I started doing it, but then I slid my dick into her pussy. I pushed it all the way in.

Id. at 271-272.[2] Appellant stated that R.A. was crying during the assault, and related that he

subsequently "blew her off because she has—well, I don't know how to say this but she has

hairy nipples, gross." Id. at 272. When asked whether he performed oral sex on her, Appellant

replied, "No, she had a very bushy pussy and it turned me off." Id.

Regarding victim S.R., Appellant stated that he "took her V card at my house," and that

he had sexual intercourse with her "[o]ne time in the woods by Bucks Meadow Apartments. One

time under a stairwell at Bucks Meadow Apartments. And the rest of the times in my home." Id.

at 274-275.[3] Finally, Appellant stated the following regarding his encounters with victim C.P.:

> She's a black girl, kind of cute. We had vaginal sex once. She came to my home on my birthday. We were hooking up and making out. We stopped because my sister was there. We then went into the kitchen and Cassidy hit me in the balls hard. I went upstairs to the bathroom holding my nuts. I dropped my pants to check out my nuts and she came into the bathroom to apologize. She kissed me and rubbed my balls. I then laid with her

---

[2] See Criminal Information No. 7832-2013; supra Part A, p. 1.
[3] See Criminal Information No. 7968-2013; infra Part D, p. 10.

6

in the bathtub and ate her pussy. While I was eating her pussy my sister walked in and saw us so we stopped.

A few nights later she was over my house and wanted to lose her V card so we were going to pop her cherry, but then she wanted to have anal sex instead. I did anal to her but couldn't stay hard. Later that night I popped her cherry. The sex lasted two to three hours. It was really good sex.

About a week later she came over and agreed to sex. Just as I was about to slide my dick in she changed her mind so I busted a nut on her chest instead.

Id. at 275-277.[4] Appellant stated that he had sex with C.P. twice, "[o]nce vaginal and once anal. And the one time I just busted a nut on her chest, too. Other times I would just eat her pussy and stuff." Id. at 277-278.

Appellant subsequently provided the following written statement via text message to Detectives McMullen and Nieves:

I'll admit to technically raping [M.D.] and I feel horrible about it. It kills me knowing what I have done to [her]. I have been through the same thing. I lost my card by rape, and I know how it feels and what it's like. I wish I had more control over it, and that I wish I knew that there was help for this [be]cause I beat myself up about it all the time. I cut myself [be]cause of my memories. I wish I could fix everything I've done. I want help. I hate being like this, and I honestly don't want sex and never did. I've realized I only do it to feel love, and I wish I could stop having sex. There's no point, I honestly don't enjoy it that much. All I want is to change this flaw about me, I can't take it anymore. I've screwed up, but if I knew there was help for people like this, I would have went and got help for it. It's just not me at all. I want to be myself, but my past can't help me get through life. I need some help. I need to get this off my mind. I don't want to get horny ever, I just want to be happy and haven't been happy since I was 15. When I was 15 I started hurting and cutting myself. I've gone through this for too long. I need help and I want help. My life is off balance, and I wish I could just be who I really am and not what my mind makes me feel and do.

Id. at 290-292. In an additional text message, Appellant wrote the following statement:

[J.P.], [R.A.], [M.D.], [S.R.], these are the girls I've done this to and I feel horrible about it . . . . I admit to raping [J.P.]. I feel horrible about what I've done and I'm truly sorry for what I did to you. I know it's hard going through what I did. I wish I could change it. I'm truly sorry that I raped you in the graveyard at Neshaminy Mall. As you know, [J.P.], we really got in it that day. We were enjoying. You started digging your nails in my back and it got to me to where I didn't want to stop when you said to stop when I put

---

[4] See Criminal Information No. 1877-2014; infra Part F, p. 14.

you on top. I'm sorry for what I did to you, and I wish I could fix it. I admit to also raping [R.A.] and [S.R.]. [R.A.] was at Bensalem High School, [S.R.] was at an apartment complex in Bucks Meadows.

Id. at 294-297.

The jury found Appellant guilty of one count of Rape by Forcible Compulsion, one count of Involuntary Deviate Sexual Intercourse by Forcible Compulsion, one count of Sexual Assault, one count of Aggravated Indecent Assault without Consent, and one count of Indecent Assault without Consent.

## C.    Criminal Information No. 7834-2013

In 2011, Appellant and victim J.P. were classmates at Foundations Behavioral Health Partial Program, an inpatient and outpatient hospital and school. Id. at 17-21. When they first exchanged cell phone numbers at the school and began to communicate via text message, she was fourteen years old. Id. Appellant subsequently asked J.P. by text message to be his girlfriend. Id. He knew that J.P. was a virgin because they had discussed the topic at school. Id. at 52.

One day, J.P. went to the Neshaminy Mall in Bensalem, Bucks County with her best friend and her friend's family. Id. at 22. After arriving at the mall, J.P. and her friend met Appellant and another male outside of the Sears Department Store. Id. at 23. Appellant asked J.P. for a kiss, and she obliged. She observed that Appellant had brought condoms because he "was pulling them out of his pocket and blowing them up" inside the mall. Id. at 24.

When they walked outside of the mall, Appellant said to J.P. that he needed to speak with her. Id. at 25-26. She replied, "okay, but I'm not doing anything." Id. J.P. and Appellant proceeded to walk together to the Neshaminy Mall road sign on the outside of the mall. Id. at 25-27. When they arrived at the sign, Appellant pushed J.P. to the ground and climbed on top of her. Id. at 27. Although J.P. told him that she "didn't want to do anything[,]" Appellant slid her

8

leggings off, removed his pants, and penetrated her vagina with his penis. Id. at 27-28.
Appellant did not use a condom during the intercourse and threw J.P.'s cellphone away because her best friend was calling her during the assault. Id. J.P. told Appellant that she did not want to have sex, but Appellant "was trying to convince me that it was okay, that we were fine. And I was really embarrassed and I started to cry and I told him no. And he kept on doing it and wouldn't stop." Appellant eventually stopped because cars began to pass by the road sign. They subsequently walked back to Sears. Id.

Appellant assaulted J.P. several additional times when she met him in a wooded area between a graveyard and a CVS store in Bensalem, across the street from Neshaminy Mall. Id. at 29-31. During the first incident in this location, J.P. again told him that she didn't want to have sex. Id. When she tried to call her mother via cellphone, Appellant placed the cellphone out of her reach. Id. As Appellant pulled down J.P.'s pants, she told him that she had "just end[ed] her cycle" in an attempt to deter his advances. Id. at 62-63. However, Appellant responded that this "turns him on." Id. Appellant subsequently climbed on top of J.P. while she was on a "log" and penetrated her vagina with his penis. Id.

In a later incident at that location, Appellant repeatedly asked J.P. to perform oral sex upon him. Id. at 32-33. While sitting together against a tree, Appellant unzipped his pants, took out his penis and said, "try it." Id. at 34-35. When J.P. replied that she didn't want to perform oral sex and that she was scared, Appellant put his hand behind her neck, pushed her head down and forced her to perform oral sex on his penis. Id. When J.P. gagged and said that she felt sick, they walked back to the Macy's Department Store at the Neshaminy Mall. Id. at 36-37.

On June 17, 2012, Appellant assaulted J.P. again when she met him at the Cornwells Heights Train Station in Bensalem, Bucks County. Id. at 40-43. While they were sitting in a

9

grassy area near the train station, Appellant attempted to pull her pants down as he climbed on top of her. Id. at 43-45. As J.P. attempted to push him away and crawl backwards, Appellant slid his left hand down the front of her pants, between her boxers and underwear, and touched the outside of her vagina with his fingers. Id. J.P. felt "scared" and "hopeless" because "it happened many times before, I couldn't stop it and I can't stop it again." Id. at 45-46. She eventually pushed him hard, causing him to fall backwards, and she sat away from him so that she could call her sister. Id. at 46. As she attempted the phone call, Appellant approached her from behind and began to touch her chest through her shirt. Id. When J.P. told him to stop, he replied that he wanted to have a threesome with her. Id. J.P. then stood up and began to walk home, while the Appellant followed her on his bicycle. Id. at 47.

When she returned home, J.P. told her sister that the Appellant had raped her and that she was afraid of him. Id. at 48, 81-83. Her mother and sister called the police, and Bensalem Township Police Officer Katherine Deppenschmidt interviewed J.P. regarding the assault. Id. at 87-91. During the interview, Officer Deppenschmidt observed grass stains on J.P.'s underwear. Id. at 91.

The jury found Appellant guilty of one count of Rape by Forcible Compulsion, one count of Involuntary Deviate Sexual Intercourse by Forcible Compulsion, and one count of Indecent Assault by Forcible Compulsion.

### D. Criminal Information No. 7968-2013

Victim S.R. met the Appellant on Facebook while she was a freshman at Bensalem High School. N.T. 8/20/14, p. 90-93. S.R. recognized Appellant's last name on Facebook because she was a classmate of Appellant's younger sister. Id. As they began to communicate via text message, he asked her to be his girlfriend, and she agreed. Id. at 94. S.R. had previously revealed to Appellant via text message that she was a virgin. Id. at 104.

10

On one occasion, S.R. was socializing with Appellant and several friends at the Bensalem Public Library and neighboring public park. Id. at 96. Appellant asked S.R. to follow him to his apartment, and she agreed. Id. After an approximately five-minute walk, they arrived at his apartment in Bensalem. Id. at 98. The entrance to the apartment complex consisted of a door on the ground floor to a common staircase, which then led to Appellant's second-floor apartment. Id. at 96-99. When S.R. and Appellant ascended the stairs and attempted to enter the apartment, they could not open the locked door. Id. at 99. Appellant called his brother on his cellphone to ask whether he was available to unlock the door. His brother replied that he would not return until a later time. Id.

After ending the call, Appellant turned to face S.R., pushed her against the wall opposite to the door, and started to kiss her. Id. Appellant tried to put his hands down S.R.'s pants. She said stop, and he eventually complied. Id. at 99-100. Appellant continued to kiss S.R., told her to "relax," and attempted to put his hands down her pants a second time. She asked him to stop again and attempted to push him away, but he persisted. Id. at 100. Appellant used his fingers to penetrate S.R.'s vagina and lowered his pants. Id. at 100-101. S.R. said that they should stop because they did not have a condom and "I didn't think it was a good idea [be]cause there was a door right there." Id. Appellant replied, "no one lived down there" and repeated that she should "relax." Id. When she told him to stop for the third time, Appellant pulled up his pants, sat down on the stairs, and asked S.R. to sit next to him. Id. at 101-102.

When S.R. sat down, Appellant climbed on top of her, began to kiss her, and pulled his pants down again. Id. at 102. When S.R. protested again because they did not have a condom, Appellant retrieved a condom from his wallet and put it on his penis. Id. Appellant then penetrated S.R.'s vagina with his penis. When S.R. protested during intercourse, Appellant

11

replied that it was "fine," and that the pain she felt from intercourse was due to the use of the condom. Id. at 102-103. S.R. felt "gross" during the incident, and recalled that Appellant removed the condom at some point during sex. Id. at 103-105. They subsequently walked back to the public park to rejoin their friends. Id. at 105.

Appellant sexually assaulted S.R. again at his apartment at least three or four additional times. During these incidents, he again ignored her requests for him to stop. Id. at 106. While they continued to date, Appellant promised S.R. that he would not engage in sexual intercourse with her because it made her feel upset. Nevertheless, they still engaged in intercourse following Appellant's promise, even though S.R. did not consent to the intercourse. Id. at 110-111. She subsequently ended the relationship because Appellant began to date another girl. Id. at 107.

The jury found Appellant guilty of one count of Sexual Assault and one count of Aggravated Indecent Assault without Consent.

### E. Criminal Information No. 7969-2013

Victim M.L. first met the Appellant in 2011 while they were students at Foundations Behavioral Health Partial Program. Id. at 34. She saw him again in April, 2011, just before her fifteenth birthday, while socializing with friends at the Neshaminy Mall in Bensalem. Id. at 35-40. When her friend left to go home, Appellant told M.L. that he had to show her something outside, and led her to the parking lot. Id. ta 41-42. After a short walk through the mall's parking lot, they arrived at an area M.L. described as a "ravine" near a roadside guardrail. Id. at 42. When they arrived, Appellant pushed M.L. to the ground and attempted to kiss her while removing her sweatshirt and jeans. Id. at 47-48. She could not remember whether she told the Appellant to stop. Id. at 48-49. Appellant eventually removed her clothes, unzipped his pants, climbed on top of her and penetrated her vagina with his penis. Id.

12

Appellant penetrated her for several minutes before M.L. managed to free herself by kicking him. Id. at 50. She subsequently managed to pull up her pants and run back to the Barnes and Noble store at the mall. Id. at 50-52. While she walked around the store and waited for her mother to pick her up, M.L. began to cry. Id. When her mother picked her up, M.L. was initially too embarrassed to disclose the assault. Id. at 55-56. M.L. told the friend who accompanied her to the mall, but the friend did not believe her. Id. M.L. eventually disclosed the abuse again during outpatient group therapy at the Horsham Clinic in October, 2013, and the disclosure was referred to the Bensalem Township Police Department. Id. at 56-58.

The jury found Appellant guilty of one count of Rape by Forcible Compulsion, one count of Sexual Assault, and one count of Indecent Assault without Consent.

**F.    Criminal Information No. 1877-2014**

Victim C.S. first contacted Appellant through the website MeetMe in 2012 when she was fifteen years old. Id. at 163-164. She first met the Appellant at the public park in front of the Bensalem Township Police Department, and subsequently returned with him to his apartment. Id. at 166-169. After socializing, C.S. had consensual sex with the Appellant in his apartment. Id. at 169-170.

C.S. met Appellant at his apartment again on April 20, 2013. Id. at 171-172. C.S., Appellant, and his sister were playing video games in the basement when the Appellant's sister left to go upstairs. Id. at 173. After playing for a few minutes, Appellant said, "I'm bored," and began to tickle and kiss C.S. Id. Although C.S. said, "stop, what are you doing," Appellant lifted her shirt, kissed her stomach, and began to pull off her pants. Id. C.S. continued to say, "come on, what are you doing, this is stupid, get off me," while the Appellant digitally penetrated her vagina and performed oral sex on her. Id. at 173-174. Appellant ignored her pleas for him to stop. Id. C.S. eventually pushed Appellant off and went home. Id. at 175. She

13

later disclosed the incident to her cousin as they walked from the Appellant's apartment to her home. Id. at 177-178. Although C.S. returned to Appellant's home that evening to attend a house party, she did not discuss the incident with Appellant because she wanted to "pretend it didn't happen." Id. at 180-181. Bensalem Township Police eventually interviewed her regarding this incident on June 18, 2012. Id. at 181.

Victim C.P. was a freshman student at Bensalem High School when she first met Appellant through his sister. Id. at 130-131. In 2012, she went to the Appellant's apartment for his eighteenth birthday party. Id. at 139-141. At the party, Appellant began to consume alcohol and kissed C.P. They began to date shortly afterwards and communicated via text message. Id. at 141-144. On a later occasion, C.P. went to Appellant's apartment and they performed anal sex in the basement. She noted that her "virginity was incredibly important to me, and he wanted to do something, and me being a new girlfriend I wanted to make him happy . . . ." Id. at 144-145.

Within a few days of this initial contact, Appellant became more aggressive with C.P. because he grew impatient with her desire to preserve her virginity. Id. at 146-147. C.P. described a typical interaction as follows:

> Well, we don't—when we got to his house, it started that he would always try and get me in the basement and he would convince me to go down to the basement or he would like pick me up trying to be cute and carry me down to the basement. And it would always start with me going I don't really want to do this, and just very casually.
>
> And then it would proceed to him—he would try and give me hickies. He like to leave hickies everywhere on me, and he would start doing that. And after he would do that, he would start to take my clothes off, and even then I would be telling him to stop.

Id. at 147. Appellant became "much more aggressive" in response to C.P.'s pleas for him to stop. Id. Appellant told C.P. that kissing "always led up to sex. So that's always how it ended. If he started kissing me at all, even a little bit, I knew we were going to end up having sex." Id. at 148. During these interactions, C.P. constantly told Appellant that she did not want sexual

14

intercourse. He rejected her pleas and told her "how good things were feeling for him, or how good things were going to feel for me, and how we had to keep having sex so [C.P.] could get used to it and it wouldn't hurt." Id.

During sex, Appellant would refuse to wear condoms, and always promised C.P. that he would "pull out in time, and he would usually finish on my stomach." C.P. would be in frequent pain during intercourse, and there would usually be blood on the mattress or on Appellant's body because he was "really incredibly rough." Id. at 149. Appellant would frequently penetrate her vagina with his fingers and attempt to put his hands down her pants "whether we were outside or in his room. He was very grabby in public." Id. at 149-150.

Appellant assaulted C.P. again in several other locations, including her father's office on December 31, 2012, and in the woods behind a nearby retirement community during the following week. Id. at 151. During one incident, Appellant pushed C.P., carried her upstairs, and held her up against the wall in the shower as he sexually assaulted her. Id. During these assaults, Appellant would frequently hold C.P. by her neck and choke her as he penetrated her vagina with his penis. On one occasion, she almost passed out from being choked. Id. at 151-152. C.P. would usually cry during these encounters, prompting Appellant to say "don't worry baby, I'm going to be done soon. It feels so good, I'm going to be done soon . . . ." Id. Although Appellant frequently told C.P. that he "didn't mean for this to happen today. I know— next time we're together I promise we won't have sex," he broke his promise to C.P. "constantly." Id. at 153. Finally, on one occasion, C.P. screamed in Appellant's bedroom during sex, prompting Appellant's sister to come downstairs to investigate. When his sister sat on the steps where she could see the bed, Appellant told her to get out. Id. at 159.

15

C.P.'s parents eventually forced her to end the relationship because it became "very apparent" that Appellant was abusive towards her. Id. at 159-160. In September, 2013, C.P. disclosed the assaults when Detective Nieves pulled her out of her class to interview her regarding the Appellant. Id. at 155.

Regarding victim C.S., the jury found Appellant guilty of one count of Sexual Assault, one count of Aggravated Indecent Assault without Consent, and one count of Indecent Assault without Consent. Regarding victim C.P., the jury found Appellant guilty of one count of Sexual Assault, one count of Aggravated Indecent Assault without Consent, and one count of Indecent Assault without Consent.

### G.    Criminal Information No. 3264-2014

Victim K.P. met the Appellant through a mutual friend when she was seventeen years old in 2011. Id. at 193-194. In September, after communicating with him via text message, she met Appellant at the cemetery near the Neshaminy Mall in Bensalem after school. Id. at 196. As soon as she approached him, Appellant began to kiss her, which was acceptable to her. Id. at 197. Appellant continued to kiss K.P. when they sat down on a nearby bench to talk. Id. at 197. As they sat on the bench, Appellant tried to unbutton and remove K.P.'s pants. She told him to stop and tried to pull her pants back up. Id. at 198-199. Appellant eventually shoved K.P. to the ground, pulled down her pants, and continued to unbutton them while on top of her. Id. at 199-200. Although she initially said no, K.P. gave up because she believed "there was no point in fighting him anymore." Id. at 200. Appellant then penetrated her vagina with his penis; he did not use a condom and ejaculated inside of her. Id. at 200-201. After he ejaculated, Appellant stood up, pulled up his pants and began to walk away "like nothing happened." Id. at 201. As he walked away, he turned around and said to K.P., "I bet you're pregnant." Id.

16

Appellant sexually assaulted K.P. a second time in the cemetery one week later. Id. 202-203. Appellant again did not use a condom and ejaculated inside of her. Id. at 204. Following this second incident, K.P. did not contact Appellant again until six weeks later, when she discovered that she was pregnant. Id. at 207. She did not have any other sexual partners during this time. Id. When she disclosed her pregnancy to Appellant, he said that she "can't tell him that because he just found out he had another girl pregnant." Id. She disclosed the assault for the first time to her friend when she was six months' pregnant, and reported the assault to police after viewing a news article about the Appellant on Facebook. Id. at 208-209.

The jury found Appellant guilty of one count of Sexual Assault.

## H. Criminal Information No. 3265-2014

Victim H. B. first met Appellant in the ninth or tenth grade while they were classmates at the Valley Day School in Morrisville, Bucks County. Id. at 277-279. Appellant asked H.B. if she wanted to date him, and she agreed. Id. at 279. While they dated, Appellant asked H.B. whether she was a virgin, whether she was ever involved in a threesome, and her bra size. Id. at 280.

When she was sixteen years old, H.B. arranged to meet Appellant at the CVS store in Bensalem through the Facebook Messenger application. Id. at 281. Appellant asked whether he could take H.B. into a wooded area behind the store, but she declined. Id. at 282. H.B. started to walk home because her mother called her on her cellphone and asked her to "check-in," or physically report to her home once per hour so that her mother could verify H.B.'s well-being. Id. at 282-283. Appellant replied that he would go home with her. Id. When they arrived at her home in a nearby trailer park, Appellant walked around with H.B. and repeatedly asked her whether she wanted to have sex. Id. at 284. Although H.B. repeatedly declined, Appellant "kept asking so much that [she] finally said yes." Id.

17

Appellant and H.B. walked to a patch of bamboo trees behind a neighbor's house. He began to kiss her and removed her shirt, followed by her bra, pants and underwear. Id. at 285. When Appellant penetrated H.B.'s vagina with his penis, she felt "[u]ncomfortable and not ready for it." Id. Approximately two minutes after they initiated intercourse, H.B. said no, but Appellant ignored her and kept going. Id. Although H.B. told him that it hurt and she was in pain, Appellant told her it "will only be a few more minutes, just let me keep going." Id. at 285-286, 289. H.B. "basically just laid there and let him do it because I knew that I wasn't going to be able to get myself away. I wasn't strong enough." Id. at 285-286. Appellant did not use a condom and eventually ejaculated inside of her. Id. at 286-287. After he finished, H.B. felt "disgusting" and "uncomfortable," and Appellant walked away as if nothing had happened. Id. at 287.

A few months after the assault, H.B. discovered that she was pregnant. Id. at 288. When she attempted to communicate with Appellant over Facebook, he "didn't want anything to do with [her]." Id. She subsequently called Appellant on his cellphone to inform him of the pregnancy. During the phone call, Appellant "started screaming at me and yelling at me and calling me a fucking cunt, and that I need to get it aborted." Id.

The jury found Appellant guilty of one count of Sexual Assault.

I.      **Criminal Information No. 3266-2014**

Victim J.M. first met the Appellant on myyearbook.com in 2011 when she was seventeen years old. Id. at 225-227. That year, J.M. was attending a baby shower at the Arbor Lane Apartments in Trevose, Bucks County, when she agreed to meet the Appellant nearby. Id. at 228-230. She initially met Appellant in the parking lot of Arbor Lane Apartments with her friend, although her friend returned to the baby shower shortly thereafter. Id. at 232-233. When Appellant and J.M walked between two parked cars in the parking lot, he pushed her down onto

18

the grass between the two cars. Id. at 234. He then pulled down her pants, moved her underwear to the side and performed oral sex upon her. Id. at 234-235. J.M. said, "no, stop, I have to go back to the party," but Appellant ignored her and continued. Id. at 236.

She eventually crawled backwards, stood up, pulled her pants up and began to walk away. Id. at 237. Appellant walked with her with his arm around her body, and led her to a transformer box in the apartment complex. Id. at 237-238. Although J.M. told him repeatedly that she needed to leave, he insisted that she move closer to him and the transformer box. Id. When she approached him, he pushed her against a fence and the transformer box, pulled down her sweatpants, and attempted to have sexual intercourse with her. 238-240. As he held her against the fence, J.M. struggled and kicked her legs so that she could get down. Id. at 239. When she eventually freed herself, she walked away and returned to the baby shower. Id.

J.M. stayed at the baby shower for a few hours while communicating with the Appellant via text message. Id. at 240-241. When she left the shower, he asked her to return to Arbor Lane Apartments via text message. She later returned to the apartments in her stepfather's car. Id. When they met in the center of the Arbor Lane Apartments parking lot, Appellant sat in the passenger seat and directed J.M. to move the car to the back corner of the parking lot. Id. at 242. After she moved the car, Appellant climbed into the back seat and asked her to join him. After talking for a few moments, they removed their clothing and began to have sexual intercourse. Id. at 243-244. Although J.M. initially consented to the intercourse, Appellant became rougher with her. Id. at 244. She began to cry in pain and told him to stop, but he ignored her, saying that it was "supposed to hurt." Id. at 244-246.

J.M. drove the Arbor Lane Apartments the following day, and continued to meet him every day for the next week. Id. at 248-255. Each time, Appellant and J.M. engaged in sexual

19

intercourse in the car's back seat. J.M. told him to stop when he became rougher with her, and cried several times when the sex became painful, but the Appellant ignored her pleas. Id. at 250-254. On one occasion, while J.M. performed oral sex on his penis, Appellant would hold her head down to the point where she could not breathe and began to choke; Appellant continued to hold her head down nonetheless. Id. at 256. Although J.M. attempted to avoid the meetings by telling Appellant she had to work, he repeatedly sent her text messages saying that he needed to see her. Id. at 254-255. J.M. continued to see him because she "thought [she] deserved it." Id. at 255. She did not disclose the sexual assaults to police until November, 2013, when she heard of Appellant's arrest on the news, because she was afraid of him. Id. at 258-259.

The jury found Appellant guilty of one count of Sexual Assault.

## II. PROCEDURAL HISTORY

The following Juvenile Petitions were filed in the above referenced cases: on September 11, 2013, Juvenile Petition No. 456-2014;[5] on September 16, 2013, Juvenile Petition Nos. 462-2013[6] and 463-2013;[7] on November 1, 2013, Juvenile Petition No. 543-2013;[8] on November 4, 2013, Juvenile Petition No. 544-2013;[9] on November 22, 2013, Juvenile Petition No. 567-2013;[10] and, on February 18, 2014, Juvenile Petition Nos. 63-2014[11] and 64-2014.[12] The Bensalem Township Police Department filed charges in Criminal Information No. 1877-2014 on November 21, 2013.

---

[5] Docketed at Criminal Information No. 7833-2013 following a transfer to criminal proceedings.
[6] Docketed at Criminal Information No. 7832-2013 following a transfer to criminal proceedings.
[7] Docketed at Criminal Information No. 7834-2013 following a transfer to criminal proceedings.
[8] Docketed at Criminal Information No. 7968-2013 following a transfer to criminal proceedings.
[9] Docketed at Criminal Information No. 7969-2013 following a transfer to criminal proceedings.
[10] Docketed at Criminal Information No. 3264-2014 following a transfer to criminal proceedings.
[11] Docketed at Criminal Information No. 3266-2014 following a transfer to criminal proceedings.
[12] Docketed at Criminal Information No. 3265-2014 following a transfer to criminal proceedings.

On September 12, 2013, the Commonwealth filed a Motion to Transfer Proceedings to Criminal Court pursuant to 42 Pa.C.S. § 6355 regarding Juvenile Petition Nos. 456-2013, 462-2013, and 463-2013. On November 18, 2013, the Commonwealth filed an Amended Motion to Transfer Proceedings to Criminal Court regarding Juvenile Petition Nos. 543-2013 and 544-2013. On November 25, 2013, this Court held a hearing and granted both Motions to Transfer. We subsequently entered an Order to transfer the above-referenced cases to the Criminal Court Division on December 4, 2013.

On February 18, 2014, the Commonwealth filed a second Motion to Transfer Proceedings to Criminal Court regarding Juvenile Petition Nos. 56-2013, 63-2013, and 64-2013. On June 4, 2014, following a hearing, we granted the Commonwealth's Motion to Transfer. We granted the Commonwealth's Motion to Consolidate all nine criminal cases for trial on June 30, 2014.

Appellant filed an Omnibus Pre-Trial Motion on August 13, 2014, followed by a Supplemental Omnibus Pre-Trial Motion on August 15, 2014. In his initial Motion, Appellant sought to preclude portions of his statement to investigators that contained the names of several women that were not part of this case. The Motion further sought to suppress Appellant's recorded prison phone calls and statements made to visitors while he was incarcerated. In his Supplemental Motion, Appellant sought to preclude his statement to investigators that he previously slept with 87 women. Appellant argued that all of these statements were irrelevant and would be unduly prejudicial at trial.

On August 18, 2014, following opening statements, this Court addressed Appellant's Motions in Limine. Regarding the admission that Appellant slept with 87 women, the Commonwealth argued that this statement was relevant within the context of Appellant's contemporaneous admissions of professed sex addiction, his motive, and the credibility of the

21

entire interview with the detectives. N.T. 8/18/14, pp. 53-58. We agreed that this individual admission was relevant within the context of Appellant's entire statement and his sexual history. Id. at 57-58. We noted, however, that we would give a cautionary instruction to the jury that "to have multiple sexual partners is not a crime, nor is he charged with a crime as to [anyone] other than the ten individuals that are part of this case." Id. at 57. We subsequently denied Appellant's Motion in Limine regarding the reference to 87 women. N.T. 8/19/14, p. 6. However, we granted Appellant's Motion regarding the specific names of the women not involved with Appellant's case, and directed the Commonwealth to excise those names from the Appellant's testimony. Id.

On August 22, 2014, following a five-day trial, a jury found Appellant guilty of three counts of Rape,[13] two counts of Involuntary Deviate Sexual Intercourse,[14] nine counts of Sexual Assault,[15] five counts of Aggravated Indecent Assault without Consent,[16] five counts of Indecent Assault without Consent,[17] and one count of Indecent Assault by Forcible Compulsion.[18] N.T. 8/22/14, pp. 121-135. We deferred sentencing pending Appellant's assessment by the Pennsylvania Sexual Offenders Assessment Board. Id. at 134.

On February 9, 2015, we sentenced Appellant as follows: in Criminal Information No. 7832-2013, four-and-one-half to nine years' incarceration on Count 1, Sexual Assault, and Count 2, Aggravated Indecent Assault without Consent, running concurrently with one another; in Criminal Information No. 7833-2013, five to ten years' incarceration on Count 1, Rape by Forcible Compulsion, and a consecutive five to ten years' incarceration on Count 3, Involuntary

---

[13] 18 Pa.C.S. § 3121(a)(1).
[14] 18 Pa.C.S. § 3123(a)(1).
[15] 18 Pa.C.S. § 3124.1.
[16] 18 Pa.C.S. § 3125(a)(1).
[17] 18 Pa.C.S. § 3126(a)(1).
[18] 18 Pa.C.S. § 3126(a)(2).

Deviate Sexual Intercourse by Forcible Compulsion; in Criminal Information No. 7834-2013, six-and-one-half to thirteen years' incarceration on Count 1, Rape by Forcible Compulsion, and Count 2, Involuntary Deviate Sexual Intercourse by Forcible Compulsion, running concurrently with one another; in Criminal Information No. 7968-2013, five to ten years' incarceration on Count 1, Sexual Assault; in Criminal Information No. 7969-2013, six-and-one-half to thirteen years' incarceration on Count 1, Rape by Forcible Compulsion; in Criminal Information No. 1877-2014, five to ten years' incarceration on Count 1, Sexual Assault, and a consecutive five to ten years' incarceration on Count 2, Sexual Assault; in Criminal Information No. 3264-2014, five to ten years' incarceration on Count 3, Sexual Assault; in Criminal Information No. 3265-2014, five to ten years' incarceration on Count 6, Sexual Assault; and, in Criminal Information No. 3266-2014, five to ten years' incarceration on Count 5, Sexual Assault. We ordered that the sentences for each Criminal Information run consecutively with one another, resulting in an aggregate sentence of 57 ½ to 115 years' incarceration. We imposed no further penalty on the remaining counts that were not previously *nolle prossed* or withdrawn prior to sentencing.

No post-sentence motions were filed. On March 6, 2015, Appellant filed a Notice of Appeal to the Superior Court. On September 21, 2015, Appellant filed a Praecipe for Discontinuance and subsequently withdrew his appeal.

On September 12, 2016, Appellant filed a Petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 et seq. This Court issued an Order on January 24, 2017, directing Appellant to file an Amended PCRA Petition. Appellant filed an Amended PCRA Petition on February 24, 2017. On January 19, 2018, Appellant filed a second Amended PCRA Petition. On February 5, 2018, upon agreement of the parties, this Court granted post-conviction

23

collateral relief in the form of reinstating Appellant's right to file a motion for reconsideration of sentence and a direct appeal therefrom *nunc pro tunc*.

On February 9, 2018, Appellant filed a Motion for Reconsideration of Sentence. Following a hearing held February 28, 2018, this Court denied Appellant's Motion. On March 12, 2018, Appellant filed a timely Notice of Appeal to the Superior Court.

## III. MATTERS COMPLAINED OF ON APPEAL

On March 19, 2018, this Court issued an Order pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) directing Appellant to file a Concise Statement of Matters Complained of on Appeal. On April 19, 2018, Appellant filed such a Statement, which raised the following issue, *verbatim*:

1. Whether the trial court erred in denying Defendant's Motion in Limine regarding the statement that he had slept with "87 women".

## IV. ANALYSIS

Appellant argues that this Court improperly denied his Motion in Limine to exclude an admission to investigators that he had previously slept with 87 women. We find that this statement was relevant to establish the context of the statements he made about the sexual assaults of the ten victims and the reason that investigators took steps to identify additional victims. We further find that the probative value of this statement outweighed its potential for unfair prejudice, and that this Court's subsequent cautionary instruction to the jury ameliorated any remaining prejudicial effect.

The decision to admit certain evidence is within the trial court's discretion and may not be disturbed absent a clear abuse of that discretion. Commonwealth v. Dengler, 890 A.2d 372, 379 (Pa. 2005). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or

24

partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." Grady v. Frito-Lay, Inc., 839 A.2d 1038, 1046 (Pa. 2003) (citation omitted).

Pa.R.E. 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Evidence is relevant if it "logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." Commonwealth v. Drumheller, 808 A.2d 893, 904 (Pa. 2002) (citations omitted).

A court may exclude relevant evidence if the danger of unfair prejudice outweighs its probative value. Pa.R.E. 403. The comment to Pa.R.E. 403 defines unfair prejudice as "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Id. However, evidence will not be excluded merely because it is harmful to the defendant. Rather, the evidence must be "so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." Commonwealth v. Antidormi, 84 A.3d 736, 750 (Pa. Super. Ct. 2014) (citations omitted). A trial court is not required to "sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." Id. at 752 (citations omitted). A determination of whether otherwise relevant evidence should be excluded due to its potential for unfair prejudice "requires a fact-intensive, context-specific inquiry." Commonwealth v. Hicks, 91 A.3d 47, 53 (Pa. 2014) (citing Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 388 (2008)).

25

This Court properly admitted Appellant's statement that he had slept with 87 women because it provided relevant context to Appellant's statement to detectives and his description of his sexual history. Regarding his sexual past, Appellant described his first sexual experience with a girl in Washington, and stated that he wished he could contact her so that she would "know what she made me become . . . a rapist." N.T. 8/19/14, pp. 268-269. Appellant further admitted that kissing "always leads to sex" for him, that he had difficulty stopping sexual activity when a girl tells him to stop, and that being told "no" fuels his desire for sex. Id. at 262, 271-273. He noted that being told "no" during sexual intercourse reminds him of his first sexual experience in Washington because he also "said no a lot" during the encounter. Id. at 270.

During the interview, Appellant admitted to having sexual intercourse with several victims known to investigators at the time: M.D., J.P., and R.A. Id. at 259, 263, 271-273. Appellant further volunteered that he engaged in sexual intercourse with several victims unknown to detectives at the time: S.R., C.P., and C.S. Id. at 273, 275-276, 278-279. Appellant admitted that he became aggressive with several of the victims during intercourse. Id. at 265-267, 270, 274. While volunteering his sexual encounters with victims known and unknown, Appellant stated that he had sexual intercourse with 87 other women. Id. at 278-279. Out of those 87 women, only "the virgins" said no to him during intercourse. Id. He identified M.D., S.R., C.P., J.P., and C.S., as the above-mentioned virgins, and noted that some of the other virgins resided in Utah, Washington, and New Jersey. Id. at 279. Finally, when the detectives asked Appellant to confirm whether he "managed to have sex with over 80 girls" since 2010, he answered, "[y]eah, I'm addicted to sex. Is there help available for it?" Id. at 280.

We denied Appellant's Motion in Limine and allowed the statement regarding 87 women because it provided the jury with relevant context to understand how the police developed the

26

evidence in this case. Appellant's statement that he had slept with 87 women provided the foundation for investigators to elicit information regarding victims known and unknown, Appellant's past sexual history, and his testimony that only the virgins rebuffed his sexual advances. Indeed, excising the statement would have likely confused the jury regarding the history and development of the Commonwealth's case. If not for this statement and the subsequent admissions that naturally followed, the identities of several victims would have remained unknown to investigators. The detailed description of Appellant's sexual experience was necessary for the jury to assess the believability and accuracy of the confession and the weight to be given to it.

Additionally, our cautionary instruction to the jury diminished this admission's potential for unfair prejudice. Commonwealth v. Hairston, 84 A.3d 657, 666 (Pa. 2014) (holding cautionary jury instruction may cure prejudicial effect of proffered evidence). Following the introduction of the statement, we provided the following limiting instruction to the jury regarding how they should consider the evidence of Appellant's prior sexual history:

> Members of the jury, I wanted to caution you that there has been reference in this testimony to sexual encounters with a number of women. This defendant is only charged with sexual assaults of ten women, and there is no allegation that he has committed any other crimes, nor should you consider that number as evidence of other crimes at this time.

N.T. 8/19/14, pp. 285-286. Appellant's counsel affirmed that this instruction was acceptable. Id. We endeavored to characterize Appellant's statement in a way that avoided undue emphasis on the nature of the sexual contact and the number of women involved. Id. Jurors are presumed to have followed a trial court's instruction. Hairston, 84 A.3d at 666. While we were not required to "sanitize" the trial of all damaging testimony, our instruction minimized the likelihood that this statement would inflame the jury or cause it to convict him on an improper basis. Thus, this

27

statement was relevant within the context of Appellant's entire interview, and because its probative value outweighed the potential for unfair prejudice, we properly denied Appellant's Motion in Limine.

## V.    CONCLUSION

For the foregoing reasons, we respectfully submit that Appellant's argument is without merit and his appeal should be denied.

DATE: June 20, 2018

BY THE COURT:

REA B. BOYLAN, J.